# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ELIZABETH BROKAW, as Personal,    )
Representative of the Estate of JAMIE   )
L. BROKAW, deceased, et al.,    )
   )
   Plaintiffs,    )
   )    **No. 15 C 4727**
   v.    )
   )    **Chief Judge Rubén Castillo**
THE BOEING COMPANY,    )
a corporation, et al.,    )
   )
   Defendants.    )

## MEMORANDUM OPINION AND ORDER

The plaintiffs in these five consolidated cases—Elizabeth Brokaw, as personal representative of the estate of Jamie L. Brokaw, William Thompson, as personal representative of the estate of Jeremy P. Lipka, Rajnit Virdi, as personal representative of the estate of Rinku Summan, Janice D. Watts and Yelana Hagan, as co-administratrix of the estate of Timothy Mark Garrett, and Gail L. Coffey, as personal representative of the estate of Gary Stockdale (collectively "Plaintiffs")—filed separate suits in the Circuit Court of Cook County, Illinois, against The Boeing Company, AAR Manufacturing, Inc. d/b/a Telair International, Inc., Telair International, GMbH, and National Air Cargo, Inc. ("NAC") (collectively "Defendants"). The suits arise from a 2013 airplane crash in Afghanistan in which Plaintiffs' family members were killed.[1] (R. 1-1, State Compl.) NAC removed the cases to this Court, asserting federal officer jurisdiction under 28 U.S.C. § 1442(a)(1). (R. 1, Notice of Removal.) Before the Court is

---

[1] Plaintiffs in the five cases are represented by the same law firm, and the filings and proceedings in those cases are materially identical. For simplicity, the Court refers solely to the filings in the first-filed case *Brokaw v. The Boeing Company, et al.*, No. 15 C 4727 (N.D. Ill. filed May 29, 2015).

Plaintiffs' joint motion to remand the cases to state court.  (R. 23, Pls.' Mot. to Remand.)  For the reasons stated below, the motion is granted.

## RELEVANT FACTS

On April 29, 2013, a Boeing 747-400 airplane operated as National Airlines Flight 102 crashed shortly after taking off from Bagram Air Base in Afghanistan.  (R. 24-3, State Compl. at 2-5.)  All seven crewmembers aboard were killed, including the five individuals represented in these actions.  (R. 24-4, National Transportation Safety Board ("NTSB") Operational Factors Group Chairman's Factual Report, Accident Docket DCA13MA081 ("NTSB Factual Report") at 5, 9.)  The plane had been carrying military cargo pursuant to a contract with the U.S. government, including five Mine Resistant Ambush Protected ("MRAP") armored vehicles that were being transported to Dubai.  (R. 27-1, Gumbs Aff. ¶¶ 3-5.)  During the flight, some cargo allegedly broke loose from its holds and penetrated a pressure bulkhead, causing the airplane to crash.  (R. 24-3, State Compl. at 31.)

Flight 102 originated out of Chateauroux, France; the flight plan was to stop at Camp Bastion and load the plane with cargo, fly to Bagram Air Base, refuel, and continue on to Dubai World Center International Airport.  (R. 24-4, NTSB Factual Report at 7.)  Camp Bastion and Bagram Air Base are both military air bases with no commercial operations other than those supporting U.S. Department of Defense ("DOD") or North Atlantic Treaty Organization ("NATO") operations.  (R. 27-1, Gumbs Aff. ¶ 4.)  Flight 102 was undertaken pursuant to a "multi-modal"[2] contract between National Air Cargo Group, Inc., d/b/a/ National Airlines and the U.S. Transportation Command ("USTRANSCOM"), a governmental entity that provides

---

[2] A "multi-modal" transportation operation is defined as one "involving more than one mode of transportation during a single journey, that permits the contractor to elect the most efficient type and/or mix of transportation methods (air, sea, rail, truck, barge, etc.) in order to meet a specified RDD (required delivery date)."  (R. 24-4, NTSB Factual Report at 6 n.5.)

support to the U.S. military, defense agencies, and other governmental organizations. (R. 27-1, Gumbs Aff. ¶ 5.) National Airlines, in turn, contracted with NAC[3] to perform the cargo operations for Flight 102. (R. 24-4, NTSB Factual Report at 7, 25-26.) NAC, an "affiliate" of National Airlines, is a cargo company that "provides airfreight broker services to the U.S. military, and to customers located in the United States and abroad, to domestic and international destinations." (R. 27, NAC's Resp. at 3; R. 24-9, U.S. Dep't of Transp. Application at 6-7.)

Because of the size of the armored vehicles, NAC chose to transport them using the following process: constructing pallets out of metal and plywood; securing the vehicles to the pallets with chains; loading the palleted vehicles onto the plane; and securing the palleted vehicles to the main deck of the aircraft with straps. (R. 24-10, NTSB Interview with Alfredo Gumbs ("Gumbs Interview") at 30-31; R. 24-13, NTSB Interview with Ralph Brown ("Brown Interview") at 8-9; R. 24-14, NTSB Interview with Charles Dsouza ("Dsouza Interview") at 11-12.) This loading procedure was developed by employees of NAC, and it was employees of NAC who actually built the pallets for Flight 102. (R. 24-10, Gumbs Interview at 31; R. 24-13, Brown Interview at 8; R. 24-14, Dsouza Interview at 12.)

Once the pallets were constructed for Flight 102, employees of NAC loaded the vehicles onto the pallets and secured them with chains. (R. 24-13, Brown Interview at 8-9.) Three of the vehicles were larger than the others, and NAC was unable to load them with an ordinary forklift. (R. 24-14, Dsouza Interview at 11-12.) After loading all the cargo that it could with its own equipment, NAC obtained assistance from the U.S. Air Force, which brought its special "60K

---

[3] NAC is presently the debtor in a Chapter 11 Bankruptcy proceeding pending before the U.S. Bankruptcy Court for the Western District of New York. *See In re Nat'l Air Cargo, Inc.*, No. 1-14-12414-MJK (Bankr. W.D.N.Y. filed Oct. 17, 2014.) NAC has opted to continue litigating these cases notwithstanding any rights it may have in the bankruptcy case, including the protections afforded by the automatic stay provision contained in 11 U.S.C. § 362(a)(1). (*See* R. 27, NAC's Resp. at 2 n.1.)

loader" to Camp Bastion to assist NAC ground crew in lifting the remaining vehicles onto the

plane. (*Id.* at 12; R. 24-13, Brown Interview at 8.) After all the palleted vehicles were loaded

onto the plane, NAC employees secured the pallets to the main deck using cargo straps. (R. 24-

10, Brown Interview at 8-9.) Some of the straps were connected to the plane's seat tracks. (R.

24-15, NTSB Interview with Dale Mitchell ("Mitchell Interview") at 61.) An employee of NAC

performed a walk-through of the plane to inspect the cargo after it was loaded. (R. 24-13, Brown

Interview at 10.) The chains and straps used to secure the vehicles were inspected by another

employee of NAC, who was present at Camp Bastion on the date of the crash. (*Id.*) After the

plane was loaded, it departed to Bagram Air Base. (R. 24-4, NTSB Factual Report at 7.) The

flight represented the first time National Airlines had transported 18-ton military vehicles. (*Id.*)

On arrival at Bagram Air Base, the plane experienced a brake-overheat warning. (*Id.*)

According to the recorded flight information, the crew ran a checklist to address the brake

temperature issue. (*Id.* at 8.) The plane was also refueled. (*Id.*) During refueling, NAC ground

crew spoke with an aircraft crewmember at the entrance of the main deck. (*Id.*) According to

the recorded data, while the airplane was still on the ramp, the captain was made aware of a

broken strap found by one of the other crewmembers, and the cockpit crew had a discussion

about a possible shift of the cargo load during landing. (*Id.*) There was further discussion about

re-securing the load prior to departure. (*Id.*) At 10:44 a.m., the plane taxied out to the runway.

(*Id.*) Shortly after take-off, the plane appeared to stall, turned to the right, and then descended to

the ground just beyond the runway. (R. 24-4, NTSB Factual Report at 9.)

The NTSB conducted an investigation into the crash of Flight 102.[4] (R. 24-4, NTSB Factual Report at 5-6.) The NTSB only investigates civil aircraft accidents, not flights operated by or on behalf of the U.S. government. *See* 49 U.S.C. § 1132; Convention on International Civil Aviation, Dec. 7, 1944, Art. 3(a)-(b), 61 Stat. 1180.

## PROCEDURAL HISTORY

In April 2015, Plaintiffs filed suit against Defendants in Illinois state court asserting negligence, product liability, wrongful death, and survival claims based on Defendants' improper design and use of the airplane on the date of the crash. (R. 24-3, State Compl.) As to NAC, Plaintiffs allege that it:

(a) negligently and carelessly failed to safely and adequately secure the cargo, including the MRAP vehicles, for transportation by air aboard the said airplane;

(b) negligently and carelessly loaded five MRAP vehicles on the said airplane for a single flight when such transportation by air could not be done safely;

(c) negligently and carelessly failed to provide safe and adequate pallets or other surface on which to place MRAP vehicles to be transported aboard the said airplane;

(d) negligently and carelessly failed to provide safe and adequate straps for securing cargo being transported on the said airplane;

(e) negligently and carelessly provided improper and unsafe instructions and directions to National Airlines regarding the preparation, securing, and transportation of the MRAP vehicles on the said airplane;

---

[4] The investigation was initiated by the International Convention on Civil Aviation and originally led by the Afghanistan Ministry of Transportation and Civil Aviation, with the participation of an NTSB representative. (R. 24-4, NTSB Factual Report at 5 n.4.) In October 2014, Afghani authorities turned the investigation over to the NTSB. (*Id.*) The NTSB is an "independent federal agency responsible for investigating airplane accidents." *Chiron Corp. & PerSeptive Biosys., Inc. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 937 (D.C. Cir. 1999). It is not a regulatory or adjudicative body; rather, "it simply analyzes accidents and recommends ways to prevent similar accidents in the future." *Id.*

(f) negligently and carelessly failed to properly and adequately train personnel in the safe and proper preparation, securing, and transportation of the MRAP vehicles aboard airplanes, including the said plane; [and]

(g) negligently and carelessly failed to adequately and sufficiently warn [Plaintiffs' decedents] of the dangers then and there existing in transporting the designated cargo, including the 5 MRAP vehicles, on one flight[.]

(R. 24-3, State Compl. at 30-31.)

On May 1, 2015, NAC was served with the state complaint. (R. 1, Not. of Removal at 1.) On May 29, 2015, NAC timely removed the case to this Court, asserting that federal officer jurisdiction exists under 28 U.S.C. § 1442(a)(1) because the "details of the [flight] operation were controlled by federal officers, the terms of a defense contract, and applicable federal regulations." (*Id.* at 3.) Because all the suits involved the same underlying event, they were consolidated before this Court for pretrial purposes. (*See* R. 16, Pls.' Mot. to Consolidate; R. 22, Min. Entry.)

On June 26, 2015, Plaintiffs filed a joint motion to remand. (R. 23, Pls.' Mot. to Remand.) They argue that federal officer jurisdiction is lacking because NAC has failed to establish that it was acting under the direction of a federal officer for purposes of the claims raised in their complaint. (R. 24, Pls.' Mem.) NAC filed an objection to the motion, (R. 27, NAC's Resp.), and thereafter, Plaintiffs filed a reply. (R. 30, Pls.' Reply.)

## LEGAL STANDARD

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). A notice of removal must be filed "within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting

forth the claim for relief upon which such action or proceeding is based." 28 U.S.C.

§ 1446(b)(1). "The party seeking removal has the burden of establishing federal jurisdiction, and

federal courts should interpret the removal statute narrowly, resolving any doubt in favor of the

plaintiff's choice of forum in state court." *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752,

758 (7th Cir. 2009). A defendant meets this burden by supporting his jurisdictional allegations

with "competent proof," which "requires the defendant to offer evidence which proves to a

reasonable probability that jurisdiction exists." *Chase v. Shop 'N Save Warehouse Foods, Inc.*,

110 F.3d 424, 427 (7th Cir. 1997) (internal quotation marks and citations omitted).

"In considering a motion for remand, the court must examine the plaintiffs' complaint at

the time of the defendant's removal and assume the truth of all factual allegations contained

within the original complaint." *Scouten v. MNL-FTS, LLC*, 708 F. Supp. 2d 729, 731 (N.D. Ill.

2010) (citation omitted). The court may look beyond the complaint and "view whatever

evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction

exists." *Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 701 (7th Cir. 2003) (citation

omitted); *see also Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002)

("[U]pon a challenge to the court's jurisdiction by a party, the court should conduct a careful

inquiry and make a conclusive determination whether it has subject matter jurisdiction or not. . . .

We conclude that the district court had not only the right, but the duty to look beyond the

allegations of the complaint to determine that it had jurisdiction[.]" (citation omitted).). In

evaluating subject matter jurisdiction, the court can consider "summary judgment-type evidence

such as affidavits and deposition testimony," as long as it does not use this evidence "to 'pre-try'

the case[.] " *CC Indus., Inc. v. ING/Reliastar Life Ins. Co.*, 266 F. Supp. 2d 813, 815-16 (N.D.

Ill. 2003) (citation omitted) (considering whether requirements of diversity jurisdiction were

satisfied). The Court can consider whatever evidence "sheds light on the situation which existed when the case was removed." *Harmon v. OKI Sys.*, 115 F.3d 477, 480 (7th Cir. 1997).

## ANALYSIS

### I. NAC's Motion to Strike

Before turning to the merits, the Court must address a preliminary matter. NAC moves to strike two exhibits attached to Plaintiffs' reply brief, which in NAC's view cannot be considered by the Court. (R. 33, NAC's Mot. to Strike.) The documents at issue are emails from two members of the U.S. Air Force, Airman Sarah Lipfird[5] and Captain Kurtis Snyder, detailing the assistance provided by the military in loading some of the armored vehicles onto Flight 102. (R. 30-4, Lipfird Email; R. 30-5, Snyder Email.) NAC argues that the emails should not be considered because they are unauthenticated and otherwise "lack any of the assurances of credibility afforded by formal affidavits." (R. 33, NAC's Mot. to Strike at 3.) Plaintiffs have filed a response to the motion and separately move to supplement their exhibits with affidavits from Airman Lipfird and Captain Snyder authenticating the two emails. (R. 37, Pls.' Resp. to NAC's Mot. to Strike; R. 36, Pls.' Mot. to Supp.) NAC has replied to these filings. (R. 38, NAC's Reply.)

NAC first asserts that the emails lack proper foundation because they are not properly authenticated. (R. 33, NAC's Mot. to Strike at 3.) The Court finds that Plaintiffs have remedied this deficiency with the affidavits they submitted along with their motion to supplement. (*See* R. 36-1, Lipfird Aff.; R. 36-2, Snyder Aff.) Plaintiffs explain in their motion that, because Airman Lipfird and Captain Snyder are presently on active duty with the Air Force, they cannot be reached except through military chains of command. (R. 36, Pls.' Mot. to Supp. at 4.) Due to

---

[5] Airman Lipfird's name has since changed to Sarah Belinskey. (*See* R. 36-1, Lipfird Aff.) For consistency, she is referred to herein as "Airman Lipfird."

the difficulties in contacting these individuals, Plaintiffs were unable to obtain the affidavits at the time the original reply was filed. (*Id.*) Less than 30 days passed between the date the reply was filed and the submission of the affidavits. There is no additional substantive information contained in the affidavits, and NAC has been afforded a full opportunity to raise any objections it has to both the affidavits and the emails. NAC has not outlined any undue prejudice it would suffer were the Court to permit the affidavits to be filed. The Court finds that the unusual circumstances described in the motion excuse Plaintiffs' brief delay and therefore grants the motion to supplement.

With the addition of the affidavits, it is clear that the emails in question were authored by Airman Lipfird and Captain Snyder in May 2013 in direct response to an inquiry by the NTSB lead investigator, Captain David Lawrence, and forwarded through the military chain of command. (*See* R. 36-1, Lipfird Aff.; R. 36-2, Snyder Aff.) They were printed from the email account of Captain Lawrence, as evidenced by the header on the emails, and were also attached as exhibits to Captain Lawrence's final report. (R. 37-4, NTSB Factual Report, Witness Statements at 19, 31-32.) The Court finds that these documents are sufficiently authenticated to be considered in connection with the motion to remand. *See* Fed. R. Evid. 901(a)-(b) (proponent of evidence must "produce evidence sufficient to support a finding that the item is what the proponent claims it is," which can be accomplished through testimony of a witness "that an item is what it is claimed to be").

NAC also argues that the emails constitute inadmissible hearsay. (R. 33, NAC's Mot. to Strike at 4-6.) Under the Federal Rules of Evidence, hearsay is defined as a statement that "the declarant does not make while testifying at the current trial or hearing" that is offered in evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(1)-(2). There

are various exceptions to the rule prohibiting the admission of hearsay, including, as is relevant here, the public records exception. *See* FED. R. EVID. 803(8)(A)-(B). The public records exception allows a "record or statement of a public office" to be admitted if it pertains to "a matter observed while under a legal duty to report" or to "factual findings from a legally authorized investigation," and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." FED. R. EVID. 803(8). This provision must be "interpreted flexibly, bearing in mind that the primary object of the hearsay rule is to bar untrustworthy evidence." *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1273 (7th Cir. 1988) (citation omitted); *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 164 (1988) (recognizing a "broad approach to admissibility" under Rule 803(8)).

There is little question that the NTSB Factual Report itself is admissible under the public records exception, and NAC does not argue otherwise. *See* 49 C.F.R. § 835.2 (providing that NTSB factual reports are admissible in civil litigation); *Mathin v. Kerry*, 782 F.3d 804, 809 (7th Cir. 2015) (district court properly admitted agency's investigation report as a public record under Rule 803(8)); *Chiron Corp. & PerSeptive Biosys., Inc. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 940-41 (D.C. Cir. 1999) (recognizing that NTSB factual reports are admissible in civil litigation); *Wells v. Foncannon*, CIV. No. 89-4265, 1992 WL 755686, at *3 (S.D. Ill. Jan. 29, 1992) (NTSB accident report was admissible under the public records exception). As NAC points out, however, the Court must consider whether the emails, which were written by third-party witnesses rather than the NTSB investigator, present independent hearsay problems. *See* FED. R. EVID. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule"); *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013) (third-party witness statements "do not become admissible for

their truth by virtue of their presence in a public record and instead must have an independent basis for admissibility").

Undoubtedly, the information in the emails could be considered if it had been submitted in the form of a sworn affidavit or declaration.[6] *See Venezia v. Robinson*, 16 F.3d 209, 211-12 (7th Cir. 1994) (district court could consider affidavits in deciding whether requirements of federal officer jurisdiction were satisfied). NAC appears to concede as much, as it submits its own affidavit in support of its arguments against remand. (*See* R. 27-1, Gumbs Aff.) NAC's principal objection appears to be with the form in which the evidence has been submitted. (*See* R. 33, NAC's Mot. to Strike at 3-5.)

However, courts are permitted to consider "summary judgment-type evidence" in deciding whether the requirements of subject matter jurisdiction are satisfied. *CC Indus., Inc.*, 266 F. Supp. 2d at 815 (citation omitted); *see also Alicea-Hernandez*, 320 F.3d at 701. In the summary judgment context, the Federal Rules permit a party to submit "materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014); *see also* FED. R. CIV. P. 56(c)(2) (material is objectionable only if it "cannot be presented in a form that would be admissible in evidence"). Extending that principle here, the facts contained in the emails written by Airman Lipfird and Captain Snyder could be presented in an admissible form—their own testimony. Airman Lipfird's affidavit and email demonstrate that she has personal knowledge of the loading of Flight 102, as she was the individual who operated the Air Force's 60K Atlas Loader. (R. 30-4,

---

[6] It appears that Plaintiffs could have mooted the parties' dispute by obtaining affidavits from Airman Lipfird and Captain Snyder attesting to the same facts contained in the emails. There is some suggestion in one of Plaintiffs' filings that the limited affidavits that have been submitted were all that could be obtained through military channels. (*See* R. 37, Pls.' Resp. to NAC's Mot. to Strike at 13.)

Lipfird Email; R. 36-1, Lipfird Aff.)  Captain Snyder's affidavit and email demonstrate that he has personal knowledge that a representative of NAC contacted the Air Force for assistance in loading the aircraft due to the weight of some of the armored vehicles; he was the person who assigned Airman Lipfird and another officer to assist NAC.  (R. 30-5, Snyder Email; R. 36-2, Snyder Aff.)  Airman Lipfird and Captain Snyder could personally testify to these matters if called as witnesses.  *See* FED. R. EVID. 602.

NAC argues that Captain Snyder cannot provide any first-hand information about the loading of Flight 102, because he acknowledges in his email that he was not present when the loading occurred.  (R. 30-5, Snyder Email.)  The Court agrees with NAC as a general proposition, but Captain Snyder's email does not purport to convey any information about what occurred during the loading process.  Instead he states that he was not told about any problems during the loading process.  (R. 30-5, Snyder Email.)  What facts he knew is a matter within his personal knowledge, and about which he could testify if called as a witness.  Accordingly, the Court finds that the emails can be considered in deciding whether subject matter jurisdiction exists in this case.

Assuming *arguendo* that the emails must meet one of the formal hearsay exceptions to be considered at this stage, the Court would find that they are admissible under the residual exception.  *See* FED. R. EVID. 807.  The emails were written under highly reliable circumstances, as they were prepared in response to the formal request of an NTSB investigator by members of the military, who responded directly through their military chain of command.  The authors attest under oath that the statements made in their emails are true and accurate.  (R. 36-1, Lipfird Aff. ¶ 4; R. 36-2, Snyder Aff. ¶ 4.)  In addition to the usual penalties for perjury, the authors of the emails are subject to military court martial for knowingly making a false statement under oath.

MANUAL FOR COURTS-MARTIAL, UNITED STATES, Part IV, para. 79 (2012 ed.), *available at*

http://www.loc.gov/rr/frd/Military_Law/pdf/MCM-2012.pdf. Under these circumstances, the

Court finds the emails sufficiently reliable to be considered in connection with the motion to

remand. *See United States v. Dumeisi*, 424 F.3d 566, 576 (7th Cir. 2005) ("Rule 807 permits

evidence to be admitted if it has sufficient 'circumstantial guarantees of trustworthiness.'");

*Parker v. Four Seasons Hotels, Ltd.*, No. 12 C 3207, 2014 WL 1292858, at *3 (N.D. Ill. Mar. 31,

2014) (finding email admissible under Rule 807 and observing that "courts have long recognized

that the prohibition on hearsay is not intended to be a mechanical bar on otherwise reliable

evidence"). For these reasons, NAC's motion to strike will be denied.[7]

## II.     Plaintiffs' Motion to Remand

Congress has granted a right of removal to federal officers who face civil or criminal

lawsuits in state court based on their official acts. 28 U.S.C. § 1442(a)(1). The removal statute

provides in pertinent part:

> A civil action or criminal prosecution that is commenced in a State court and that
> is against or directed to any of the following may be removed by them to the
> district court of the United States for the district and division embracing the place
> wherein it is pending: . . . The United States or any agency thereof or any officer
> (or any person acting under that officer) of the United States or of any agency
> thereof, in an official or individual capacity, for or relating to any act under color
> of such office[.]

28 U.S.C. § 1442(a)(1). This provision has a "long history," from its origin in 1815 as a

"congressional response to New England's opposition to the War of 1812, through its expansion

---

[7]   The Court notes that even if the emails were excluded in their entirety, the result of this opinion would be the same. The emails confirm the limited role played by the military in these events, but as is explained below, there is other evidence in the record demonstrating that the military had only a tangential role in connection with the cargo operation on Flight 102. This includes an attachment to the contract between National Airlines and USTRANSCOM, and the statements of NAC's own employees. (*See, e.g.*, R. 30-3, Performance Work Statement; R. 24-13, Brown Interview at 8-11; R. 24-14, Dsouza Interview at 11-12.) NAC has not moved to strike this evidence.

in response to South Carolina's 1833 threats of nullification . . . to enactment of the Judicial

Code of 1948 when the removal statute took its present form encompassing all federal officers."

*Mesa v. California*, 489 U.S. 121, 125-26 (1989). "The statute evinces concern that 'unfriendly'

states will impose state-law liability on federal officers and their agents for actions 'done under

the immediate direction of the national government.'" *Ruppel v. CBS Corp.*, 701 F.3d 1176,

1180 (7th Cir. 2012) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)); *see also City of

Aurora v. Erwin*, 706 F.2d 295, 296 (10th Cir. 1983) ("[S]ection 1442(a)(1) is intended to

provide a forum free from local interests and prejudice in which the federal officer can assert

immunity defenses based on official conduct."). The removal provision is, at bottom, premised

on "the very basic interest in the enforcement of federal law through federal officials."

*Willingham v. Morgan*, 395 U.S. 402, 406 (1969).

Although federal officers are the intended beneficiaries of Section 1442(a)(1), because of

the "acting under" language contained in the statute, a private party can also invoke the provision

under certain circumstances. *See Venezia*, 16 F.3d at 211-12. "Assuredly, however, the

removing party must establish that he *is* a federal official or is 'acting under' such an official."

*Id.* at 212. Section 1442(a)(1) should not be given "narrow" or "limited" interpretation,

regardless of whether it is invoked by a private party or a governmental official. *Ruppel*, 701

F.3d at 1180. The right to remove is not without limits, however, and removal is appropriate

only when some "federal interest in the matter" exists. *Willingham*, 395 U.S. at 406 (citation

omitted).

To remove a case based on federal officer jurisdiction, a defendant must establish four

elements: (1) he is a "person" within the meaning of the statute; (2) he was "acting under" the

federal government or one of its officers; (3) there is a causal nexus between the federal authority

and the conduct challenged in the plaintiff's lawsuit; and (4) he has a colorable federal defense to the plaintiff's claim. *Ruppel*, 701 F.3d at 1180-82. As to the first prong, the law is clear that corporate entities like NAC are considered "persons" within the meaning of the removal statute, and Plaintiffs do not argue otherwise. *Id.* at 1181. The second prong is also not difficult to meet, as the term "acting under" is construed broadly to encompass situations "where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Id.* at 1181. Courts have approved removal jurisdiction where a private defendant was "working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Id.* Here NAC was engaged in a task that was furthering the goals of the federal government: moving equipment for use by the U.S. military. Accordingly, the Court finds the second prong satisfied. The remaining prongs present more difficult questions and are addressed separately below.

### A.     Causal Nexus

The causal nexus prong is satisfied when the defendant establishes that the plaintiff's lawsuit "has arisen out of the acts done by him under color of federal authority and in enforcement of federal law." *Mesa*, 489 U.S. at 131-32. In other words, this element requires that the "gravamen of the claim against [the defendant] occur while it acted under color of federal authority." *Ruppel*, 701 F.3d at 1181. It is distinct from the general "'acting under' requirement in the same way a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage—there must be a causal connection between the charged conduct and asserted official authority." *Id.* (quotation marks and citation omitted). To establish a sufficient nexus, a defendant must "by direct averment exclude the possibility that

[the state lawsuit] was based on acts or conduct of his not justified by his federal duty." *Mesa*, 489 U.S. at 132 (citation omitted).

The defendant can meet this standard by showing that the acts giving rise to the plaintiff's claims were performed pursuant to a federal officer's "direct orders." *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992). It is not enough to show that the conduct at issue occurred under the "general auspices of a federal office or officer," or that the defendant was participating in a heavily regulated industry. *Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144, 1152 (D. Colo. 2002). Private defendants seeking to invoke federal officer jurisdiction must establish that "the government authority under which they worked required them to act as they did." *Id.* at 1155.

The quintessential case for removal by a non-federal actor is described in *Venezia*, in which a state employee sought to remove a lawsuit filed against him in state court, where the wrongful actions he allegedly took to solicit a bribe from the plaintiff were part of a sting operation being conducted by the Federal Bureau of Investigation ("FBI"). *Venezia*, 16 F.3d at 209-11. The Seventh Circuit found removal proper because, although the defendant was not himself a federal officer, his actions giving rise to the lawsuit were performed at the express direction of an FBI agent who was operating the sting. *Id.* at 211-12; *see also Lu Junhong v. Boeing Co.*, 792 F.3d 805, 809 (7th Cir. 2015) (observing that the "acting under" removal provision was intended to encompass, for example, "a local police officer who accompanies a federal agent on a drug raid and acts under the federal agent's direction").

There are many situations where removal under Section 1442(a)(1) will not be proper despite some federal involvement in the events giving rise to the case. For instance, the Seventh Circuit recently rejected an argument by Boeing that it was entitled to removal based on federal

officer jurisdiction in another case involving an airplane crash. *Lu Junhong*, 792 F.3d at 809-10. Boeing argued that as an airplane manufacturer, it was required to follow and certify compliance with a multitude of federal regulations regarding the design of its planes; Boeing argued that it was therefore "acting under" federal authority for purposes of plaintiff's claim that defects in the plane's warning system had caused it to crash. *Id.* at 807-09. The Seventh Circuit disagreed, finding no "correlation between the required certifications and acting-under status." *Id.* at 809. The court held that "being regulated, even when a federal agency 'directs, supervises, and monitors a company's activities in considerable detail' . . . is not enough to make a private firm a person 'acting under' a federal agency." *Id.* (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 145 (2007)). The federal regulations Boeing pointed to did not "confer on Boeing or other manufacturers a power to make rules," but only to "interpret and apply them as best it can"—a task performed by a variety of private citizens, who are not transformed into federal officers for purposes of the removal statute. *Id.* at 810. The Seventh Circuit went so far as to observe that "after today it would frivolous for Boeing or a similarly-situated defendant to invoke § 1442 as a basis of removal." *Id.* at 813.

In light of this admonition, NAC has nuanced its argument here. It does not attempt to argue that its compliance with FAA or other complex federal regulations governing the airline industry creates federal officer jurisdiction. Rightfully so, as such an argument would be frivolous after *Lu Junhong*.[8] Instead, NAC argues that federal officer jurisdiction exists because

---

[8] NAC specifically disavows that it is raising any of the arguments rejected by the Seventh Circuit in *Lu Junhong*: "NAC is not contending that federal officer removal jurisdiction is warranted based on National Airlines' status as a certificate holder subject to the Federal Aviation Regulations. Likewise, NAC is not arguing that it has been delegated authority to self-certify its own compliance with federal regulations. Rather, the basis for removal in this case centers on the extent of military involvement and control over the subject cargo transportation operation." (R. 27, NAC's Resp. at 10 n.6.)

its affiliate, National Airlines, was "carrying out duties pursuant to a contract with the United States Government," and because "the military was directly involved in loading the aircraft and controlled the details of the cargo transport operation, including, but not limited to, the type and quantity of military cargo being transported, and the starting point and final destination for such cargo deliveries." (R. 27, NAC's Resp. at 3.)

The Court disagrees that these factors establish a sufficient nexus to create federal officer jurisdiction. Although NAC was performing (at least indirectly) under a defense contract and was flying in a military zone, at bottom it was engaged in the simple act of moving cargo. There is little difference between this case and an ordinary situation in which a package is shipped via private carrier. The shipper would decide where the package was going, and perhaps the outer deadline for its arrival, but the carrier would have considerable discretion in deciding how to get the package to its destination on time. That is what occurred here. The record shows that National Airlines had significant discretion in deciding how to perform its duties under the contract with USTRANSCOM. Specifically, the contract provided:

> 1.1.1. Scope of Contract. The contractor shall provide all personnel, training, supervision, equipment . . . necessary to perform international commercial door-to-door and/or port-to-door transportation services to move DOD and other Government approved cargo. Multiple modes (i.e. airlift, sealift, linehaul) of transportation may be used to move cargo to/from multiple zones globally.

> 1.2.1. Contractors are responsible to have proper equipment and personnel necessary to be self-sufficient at all ports and installations. (Shippers will be responsible to load/unload ground conveyances at origin/final destination.)

(R. 30-3, Performance Work Statement.) National Airlines in turn hired NAC to handle the logistics of the cargo operation, and the record reflects that NAC exercised its own judgments regarding how best to transport the cargo. (R. 24-13, Brown Interview at 8-11; R. 24-14, Dsouza Interview at 11-12.) The record fails to show that the military directed—or, for that matter, had

any involvement in—the decision to ship all five MRAP vehicles on the same flight, to "palletize" the vehicles before loading them on the plane, or to secure the vehicles to the main deck of the aircraft in the manner that they were. Rather, the evidence shows that these decisions were made and carried out by NAC employees. (*See* R. 24-4, NTSB Factual Report at 7-9, 25; R. 24-10, Gumbs Interview; R. 24-13, Brown Interview; R. 24-14, Dsouza Interview.) These are the very acts that form the basis of Plaintiffs' negligence claims against NAC.

Numerous other courts have found federal officer jurisdiction lacking where, as here, there was some tangential involvement by the federal government, but the private defendant made the actual decisions that formed the basis of the plaintiff's claims. *See, e.g.*, *Cabalce v. VSE Corp.*, 922 F. Supp. 2d 1113, 1121-23 (D. Haw. 2013) (requirements for federal officer jurisdiction were not met where plaintiffs claimed they were injured while working for a government contractor responsible for destroying government-seized fireworks; despite general oversight of the facility by the government, the contractor was "operating without day-to-day control or supervision by the government of the means and methods of destruction of the fireworks"); *Mobley v. Cerro Flow Prods., Inc.*, Civil No. 09-697-GPM, 2010 WL 55906, at *5 (S.D. Ill. Jan. 5, 2010) (company that manufactured chemicals for the federal government could not invoke Section 1442(a)(1) to remove lawsuit alleging that its disposal of chemicals injured the plaintiffs, where company controlled "the actual, basic operation of the plant" and the military did not specifically direct the manner of chemical disposal); *Parks v. Guidant Corp.*, 402 F. Supp. 2d 964, 971 (N.D. Ind. 2005) (federal officer jurisdiction was lacking where manufacturer of medical device failed to establish that federal agency "effectively directed them to design, manufacture or sell the device at issue in a manner that gave rise to the claims in this case"); *Freiberg*, 245 F. Supp. 2d at 1155-56 (defense contractor could not remove case based on

federal officer jurisdiction even though plaintiffs' injuries occurred while contractor was building a nuclear weapons facility for the federal government, because the contractor failed to show that the federal government's "direction and control of their activities directly interfered with their ability to fulfill their state law obligation" to follow safe construction practices and warn of the safety hazards of asbestos); *Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1129 (E.D. Pa. 1996) (defense contractor that manufactured turbine generators for the U.S. Navy was not entitled to remove case under Section 1442(a)(1), despite evidence that the Navy had some involvement in the design of the generators, where evidence failed to show that the defendant had "acted under the immediate supervision of the Secretary of the Navy or any other officer" in connection with the use of asbestos in manufacturing the turbines, which is what allegedly caused the plaintiff's injuries).

The Court finds these cases persuasive. Simply because the federal government had some general oversight over Flight 102 does not mean NAC was acting under the authority of a federal officer for purposes of Plaintiffs' claims. *See Lu Junhong*, 792 F.3d at 809. The cases cited by NAC are distinguishable, because they involved a significantly greater level of involvement by the federal government in the specific acts underlying the plaintiff's claims. *See Greene v. Citigroup, Inc.*, No. 99-1030, 2000 WL 647190, at *2 (10th Cir. May 19, 2000) (federal officer jurisdiction existed in case involving private contractor's clean-up of a radium site, because the contractor had implemented a clean-up remedy "selected by the EPA . . . and it was subject to civil penalties for failure to comply with that directive"); *McMahon*, 410 F. Supp. 2d at 1196-97 (federal officer jurisdiction existed in case involving an airplane crash, where plaintiffs' claims against a private airline transporting military personnel and ammunition

centered on crew qualifications and route selection, matters that were specifically governed by airline's contract with the DOD or were decided at meetings with defense personnel).

Based on the record, the Court concludes that NAC has not established a sufficient causal nexus between Plaintiffs' claims and the involvement of the federal government so as to create federal officer jurisdiction.

## B.    Colorable Federal Defense

The above conclusion ends the inquiry because NAC must satisfy all four requirements for removal to be proper. *See Ruppel*, 701 F.3d at 1180-81. For the sake of completeness, the Court considers the final prong: whether NAC has established a colorable federal defense to Plaintiffs' claims. "[A]n unbroken line of [Supreme Court] decisions extending back nearly a century and a quarter have understood all the various incarnations of the federal officer removal statute to require the averment of a federal defense." *Mesa*, 489 U.S. at 133-34; *see also Venezia*, 16 F.3d at 211 ("Section 1442(a)(1) does not permit removal on the federal party's say-so; there must be a bona fide federal defense to the claim based on state law."). This factor is critical because it "not only satisfies Article III jurisdiction," but also "encapsulates Congress's desire to have federal defenses litigated in federal forums." *Ruppel*, 701 F.3d at 1182. To satisfy this prong, a defendant need not establish that his defense will ultimately be meritorious, only that he has a "colorable" defense to the plaintiff's claim under federal law. *Mesa*, 489 U.S. at 129; *see also Ruppel*, 701 F.3d at 1182 ("[T]he claimed defense need only be 'plausible.'"). If the defendant has a colorable federal defense to any of the plaintiff's claims, "then the entire case is removable." *Ruppel*, 701 F.3d at 1182.

NAC asserts three potential federal defenses in this case: (1) the Defense Base Act (the "DBA"); (2) the political question doctrine; and (3) the combatant activities doctrine.[9] (R. 27, NAC's Resp. at 11.) Despite the low threshold that applies to this factor, the Court concludes that none of these defenses are viable under the facts of this case.

## 1. Defense Base Act

NAC first argues that it has a potential defense under the DBA. (R. 27, NAC's Resp. at 11.) Enacted in 1941, the DBA creates a federal compensation scheme for defense contractors and their employees when an employee suffers injury or death while working outside the United States. *See* 42 U.S.C. § 1651 *et seq*. It does so by adopting the comprehensive provisions of the Longshore and Harbor Workers' Compensation Act (the "Longshore Act"), which provides a remedy for maritime employees who are injured on the job. *See* 33 U.S.C. § 901 *et seq.*; *see also Schmit v. ITT Fed. Elec. Int'l*, 986 F.2d 1103, 1104 (7th Cir. 1993) ("The Defense Base Act generally entitles employees at overseas military bases to benefits of the Longshore and Harbor Workers' Compensation Act[.]"). The DBA provides coverage for injury or death while an employee is performing "public work" outside the United States. 42 U.S.C. § 1651(a)(4). "Public work" is defined as "projects or operations under service contracts and projects in connection with the national defense or with war activities." 42 U.S.C. § 1651(b)(1). The term "war activities," in turn, is defined as "activities directly relating to military operations." 42 U.S.C. § 1651(b)(3).

---

[9] NAC asserts in general terms that it has "multiple federal defenses to Plaintiffs' claims, including immunity under the Defense Base Act, the Political Question Doctrine, and the Combatant Activities Doctrine." (R. 27, NAC's Resp. at 11.) Given that it is NAC's burden to establish that it has a colorable federal defense, *see Mesa*, 489 U.S. at 129, the Court limits its analysis only to those federal defenses specifically identified in NAC's response. The Court notes that NAC's answer does not contain any identifiable federal defenses other than the three listed above. (R. 11, NAC's Answer.)

A contract covered by the DBA must contain provisions requiring the contractor to secure DBA insurance on behalf of its employees. 42 U.S.C. § 1651(a)(4). The contractor must then secure and retain such coverage during the course of the contract. *Id.* "If the work being performed outside of the United States is covered by the DBA and the employer has met the procedural requirements of providing DBA insurance for its employees, the employer's liability is limited as that set forth under the DBA and therefore replaces certain state law damages claims." *Pope v. Palmer*, No. 10-13285, 2011 WL 4502859, at *4 (E.D. Mich. Sept. 28, 2011). Such recovery is limited to specified benefits, including funeral expenses and monthly payments determined according to a percentage of the employee's average wages. *See* 33 U.S.C. § 909(a)-(b).

Plaintiffs argue that the DBA does not present a colorable defense in this case. (R. 30, Pls.' Reply at 12-13.) They point out that their family members were employed by National Airlines, not NAC; in Plaintiffs' view, NAC has not demonstrated a sufficient nexus between the two companies to permit NAC to raise the DBA as a defense. (*Id.*) Plaintiffs are correct that the DBA generally preempts claims against the decedent's *employer*. *See generally* 33 U.S.C. § 905(a) ("The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of [an employee's] injury or death[.]"). In some instances courts have permitted extension of the doctrine to an entity closely related to the decedent's employer. *See Ross v. DynCorp*, 362 F. Supp. 2d 344, 347 n.1 (D.D.C. 2005) (finding DBA applicable where contract was executed by a "divisional unit" of the plaintiff's employer); *Haas v. 653 Leasing Co.*, 425 F. Supp. 1305, 1316-17 (E.D. Pa. 1977)

(joint venture and participants in joint venture were the plaintiff's "employer" for purposes of the Longshore Act).

Here NAC makes a nebulous assertion that it is a "sister corporation/affiliate" of National Airlines, without describing the exact corporate relationship between the two companies. (R. 27, NAC's Resp. at 3.) The NTSB's report reflects that National Airlines and NAC are both owned by the same "holding company," but that they are "separate companies." (R. 24-4, NTSB Factual Report at 58.) Other documents in the record also show that they have different officers and were incorporated in different states; National Airlines was a Michigan corporation at the time of the crash and is now a Florida corporation, whereas NAC was and is a New York corporation. (R. 30-6, National Airlines Corporate Records; R. 30-7, NAC Corporate Records.) Without a more detailed showing by NAC to establish a close relationship between these two companies, the Court cannot conclude that NAC was the "employer" of Plaintiffs' family members for purposes of the DBA.

Even if NAC could overcome this threshold issue, NAC has not made any attempt to show that the procedural requirements of the DBA have been satisfied. NAC points to nothing in the original contract between National Airlines and USTRANSCOM, or the subcontract between National Airlines and NAC, to show that these companies were required to obtain DBA insurance in accordance with Section 1651(a).[10] Nor does NAC attempt to show that either company actually obtained DBA insurance that covered Plaintiffs' decedents. Under the applicable law, these issues are critical to a finding that the DBA preempts Plaintiffs' claims. *See* 42 U.S.C. § 1651(a)(4) (DBA insurance must be "in full force and effect during the term of

---

[10] NAC has not submitted either contract for this Court's review and instead submits an affidavit from an employee of National Airlines describing the contract between National Airlines and USTRANSCOM in very general terms. (R. 27-1, Gumbs Aff. ¶ 5.)

such contract"); 33 U.S.C. § 905(a) (exclusivity of remedy does not apply when "an employer fails to secure payment of compensation as required" by the Longshore Act); *Martin v. Halliburton*, 808 F. Supp. 2d 983, 990 (S.D. Tex. 2011) (the DBA preempted plaintiff's state law tort claim where record showed that "[d]uring the time of [the decedent's] injury, Defendants had the requisite insurance"); *Ross*, 362 F. Supp. 2d at 353 (DBA applied where record showed "that the contract was 'to be performed outside the continental United States,' and that it contained the workers'-compensation-insurance related provisions required by § 1651(a)(5)"). Therefore, the Court cannot conclude that NAC has a viable defense under the DBA.

### 2.    Political Question Doctrine

NAC next argues that it has a viable defense under the political question doctrine. (R. 27, NAC's Resp. at 14.)  Under this doctrine, a federal court has no authority to review political questions. *Marbury v. Madison*, 5 U.S. 137, 170 (1803).  The doctrine derives from separation of powers principles: "Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in [the federal courts]." *Id.*  A question is "political" and thus not subject to judicial review where there exists:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  A case is not barred by the political question doctrine "[u]nless one of these formulations is inextricable from the case." *Id.*  There is a distinction between "political questions" and "political cases," and simply because a case has political

overtones or involves foreign affairs does not mean that it presents a non-justiciable political question. *Id.*

Not surprisingly, "military activities often give rise to political questions." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007). Courts have recognized that "the interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." *Id.* (citation omitted). Thus, decisions about "whether and under what circumstances to employ military force" and "[t]he strategy and tactics employed on the battlefield" are beyond a federal court's ability to review. *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991); *see also Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) (case presented a political question where court would have had to decide whether a U.S. military missile team "should have demanded confirmation of their superior's apparent instruction to fire a live missile"); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1497 (C.D. Cal. 1993) (case presented a political question where plaintiffs' decedents were killed by missiles fired by a U.S. Air Force aircraft, because resolving the case would "necessarily require inquiry into military strategy").

Nevertheless, not all military activities are "completely immune from judicial review." *McMahon*, 502 F.3d at 1358. The primary question is whether a particular suit will require the Court to reexamine a "military judgment," and if so, "whether the military judgment is the kind that warrants application of the political question doctrine." *Id.*; *see also Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008) (political question doctrine did not deprive the court of jurisdiction over lawsuits brought by civilian employees of defense contractor and its subsidiaries based on injuries plaintiffs suffered when the trucks they were driving came under attack by Iraqi insurgents). Given that the doctrine is largely driven by separation of powers

principles, the Court must give more scrutiny to the defense when it is raised by a private

contractor rather than a "coordinate branch of the United States government." *McMahon*, 502

F.3d at 1359.

NAC does not specify which *Baker* factor is satisfied here and instead argues generally

that this Court "cannot adjudicate Plaintiffs' claims without reexamining decision by the military

as to how best to carry out the strategic planning of its operations for transporting critical

military cargo in a war zone." (R. 27, NAC's Resp. at 17.) Plaintiffs disagree, arguing that their

claims "do not challenge the military's ultimate decisions to use private contractors in

Afghanistan or any of the other actions taken by the military." (R. 30, Pls.' Resp. at 15.) Rather,

"Plaintiffs challenge the way in which NAC performed its work in palleting and attempting to

secure the MRAPs on the doomed aircraft." (*Id.*) In Plaintiffs' view, deciding whether these

actions were negligent will not require the Court to second-guess any sensitive military

judgments. (*Id.*) The Court agrees with Plaintiffs.

The Court finds *McMahon* instructive, which ironically enough also involved a plane

crash at Bagram Air Base. 502 F.3d at 1337. In that case, an aircraft operated by Presidential

Airways ("Presidential") pursuant to a contract with the DOD was transporting U.S. soldiers

serving in Afghanistan. *Id.* at 1336. Shortly after takeoff, the plane crashed into the side of a

mountain, killing the soldiers aboard. *Id.* Their family members subsequently brought a

wrongful death suit against Presidential. *Id.* Presidential moved to dismiss the case, in part on

political question grounds, but the Eleventh Circuit rejected this argument. *Id.* at 1359-65. The

court pointed out that the allegations underlying the plaintiffs' suit were that Presidential had

"negligently staffed, equipped, and otherwise operated the flight in question." *Id.* at 1360.

Pursuant to Presidential's contract with the defense department, those issues were Presidential's

responsibility, not the military's. *Id.* Specifically, the contract "envisioned that Presidential was to have general responsibility for making the decisions regarding the flights it provided to DOD." *Id.* Although there was some general oversight and involvement by the military because the flight was being conducted in a warzone, "the military's duties . . . were relatively discrete." *Id.* at 1361. For instance, "[t]he military chose the start and end points of the flights, and chose when the flight would be flown." *Id.* The military also imposed "certain constraints" on the flight operation, including limiting the work hours of pilots and specifying minimum and maximum amounts of passengers and cargo. *Id.* But, the court noted, the plaintiffs' allegations did not "relate to any of these discrete areas of military responsibility." *Id.* Thus, resolving the case would not require the court to review sensitive issues involving combat or "any peculiarly *military* activity at all." *Id.* at 1363. The court observed: "As in any tort suit involving a plane crash, the court will simply have to determine whether the choices Presidential made were negligent." *Id.* at 1364.

This same reasoning applies here. Despite the fact that the crash of Flight 102 occurred at a military base during a time of armed conflict, the case implicates ordinary tort principles. Plaintiffs' claims against NAC focus on whether NAC employees were negligent in the manner in which they chose to transport and secure the cargo inside the aircraft.[11] That cargo happened to be military equipment, but NAC's task was no different than if it had been transporting any

---

[11] When a case is alleged to present a political question, courts have attached significance to whether the government has opted to participate in the case. *See McMahon*, 502 F.3d at 1365 ("The apparent lack of interest from the United States to this point fortifies our conclusion that the case does not yet present a political question."); *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard the Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1204 n.14 (5th Cir. 1978) (observing that "whether the state department believes that judicial action would interfere with its foreign relations is germane" to the court's determination of whether a case presents a nonjusticiable question). The Court notes that neither the military nor any other branch of the federal government has sought to intervene in this case or otherwise weighed in on whether the case presents a political question.

other type of cargo for a private shipper. Undoubtedly, "flying over Afghanistan during wartime is different from flying over Kansas on a sunny day," but that does not make what is essentially an ordinary negligence case "inherently non-justiciable." *McMahon*, 502 F.3d at 1364; *see also Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1239 (D. Or. 2010) (political question doctrine did not bar claim against defense contractor based on injury suffered by plaintiff from exposure to chemicals while working for contractor in Iraq; case implicated ordinary tort principles, and "the fact that the torts at issue here were committed in the context of services performed under a contract with the military does nothing to render those standards inapplicable"); *Lessin v. Kellogg Brown & Root*, No. CIVA H-05-01853, 2006 WL 3940556, at *3 (S.D. Tex. June 12, 2006) (political question doctrine did not apply to plaintiff's claim regarding injury suffered during military convoy, where the "incident at issue . . . was, essentially, a traffic accident," and resolution of the claim did not require inquiry into military strategies or judgments).

In support of its argument that the case presents a political question, NAC cites to *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006), and *Carmichael v. Kellogg, Brown & Root Servs, Inc.*, 572 F.3d 1271 (11th Cir. 2009). (*See* R. 27, NAC's Resp. at 16-17.) In *Whitaker*, the political question doctrine was found to preclude a wrongful death suit brought by the parents of a U.S. soldier who was killed while escorting a military supply convey operated by a government contractor. 444 F. Supp. 2d at 1278. The plaintiffs' son, Whitaker, had been driving an Army escort vehicle when he stopped on a bridge; another driver then struck his vehicle from behind, knocking it perilously close to the edge of the bridge. *Id.* As he tried to extricate himself from the vehicle, he fell off the bridge and drowned. *Id.* Plaintiffs sought to hold the contractor liable for the negligence of its driver. *Id.* In finding that the case presented non-justiciable political questions, the court found it critical that the

Army regulated "all aspects of control, organization, and planning of Army convoy operations." *Id.* at 1279. The court also noted that as a general matter cases brought by "soldiers injured at the hands of the military raise political questions." *Id.* at 1281. Given that the military controlled all aspects of the convoy operation in which a U.S. soldier had been injured, the court found that the political question doctrine barred review of plaintiffs' claims. *Id.* *Carmichael* also involved a U.S. soldier who was injured during a military convoy. 572 F.3d at 1276-77. In finding that the case presented non-justiciable political questions, the court found it critical that the case involved a U.S. soldier and that the planning and execution of the convoy operation had been entirely within the control of the military, which would require the court to review "many sensitive judgments and decisions entrusted to the military in a time of war." *Id.* at 1281.

The Court finds these cases distinguishable from this case in very critical ways. Plaintiffs are not U.S. soldiers; they are family members of civilians employed by a private airline. Nor is this a case where the military controlled "all aspects" of the events giving rise to Plaintiffs' claims. *See Whitaker*, 444 F. Supp. 2d at 1279. Instead, the military had only tangential involvement in these events, in that it hired National Airlines to transport the cargo at issue and chose the start and end points of the flight. The decisions about *how* to transport the cargo were made by employees of NAC, and those are the acts that underlie Plaintiffs' claims. Resolution of these claims does not require inquiry into sensitive military judgments or decisions. For these reasons, the Court finds no merit to this potential defense.

### 3. Combatant Activities Doctrine

Finally, NAC argues that it has a potential defense under the "combatant activities" exception to the Federal Tort Claims Act ("FTCA"). (R. 27, NAC's Resp. at 17.) The FTCA provides a waiver of sovereign immunity for tort claims filed against the government. 28 U.S.C.

§ 2671 *et seq.* However the FTCA also expressly preserves the government's sovereign immunity in connection with "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The doctrine represents a "Congressional acknowledgement that war is an inherently ugly business for which tort claims are simply inappropriate." *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 18 (D.D.C. 2005); *see also Saleh v. Titan Corp.*, 580 F.3d 1, 7 (D.C. Cir. 2009) ("[T]he policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit.").

There is some conflict in the law as to whether the combatant activities doctrine can ever apply to a private contractor. *Compare Saleh*, 580 F.3d at 7 ("[T]he policies of the combatant activities exception are equally implicated whether the alleged tortfeasor is a soldier or a contractor engaging in combatant activities at the behest of the military and under the military's control."), *with McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1330 (M.D. Fla. 2006) ("Unless they qualify as employees or agents of the Government, private contractors may not bootstrap the Government's sovereign immunity."). As one court commented in criticizing the application of the doctrine to private contractors:

> [T]he combat activities exception to the FTCA by its own terms operates to *preserve* the federal government's independently existing sovereign immunity, and in no way suggests that involvement in the 'combatant activities of the military or naval forces, or the Coast Guard' could *confer* sovereign immunity on any private actor that, absent such involvement, would lack such immunity.

*Bixby*, 748 F. Supp. 2d at 1244. In another court's view, the few courts that have applied the doctrine to shield private contractors may have "unwittingly confused the government contractor

defense and the combatant activities exception to the FTCA."[12] *McMahon*, 460 F. Supp. 2d at 1330. The court observed: "There is no express authority for judicially intermixing the government contractor defense and the combatant activities exception; nor is there authority for bestowing a private actor with the shield of sovereign immunity." *Id.*

Assuming that the doctrine ever applies to private contractors, NAC does not qualify for it here. "'Combat' connotes physical violence," and "'combatant,' its derivative, . . . connotes pertaining to actual hostilities." *Bixby*, 748 F. Supp. 2d at 1243 (citation omitted). Not every activity tangentially connected with the military will qualify for protection. *Id.* As the Ninth Circuit explained:

> The act of supplying ammunition to fighting vessels in a combat area during war is undoubtedly a 'combatant activity,' but this fact does not make necessary a conclusion that all varied activities having an incidental relation to some activity directly connected with previously ended fighting on active war fronts must, under the terms of the Act, be regarded as and held to be a 'combatant activity[.]' The rational test would seem to lie in the degree of connectivity. Aiding others to swing the sword of battle is certainly a 'combatant activity,' but the act of returning it to a place of safekeeping after all of the fighting is over cannot logically be cataloged as a 'combat activity.'

*Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948).

NAC believes the defense applies here because "the Subject Flight was a military cargo transport operation under the military's direction and control, and was necessary to and directly connected with combatant activities in a war zone." (R. 27, NAC's Resp. at 18.) Respectfully, the activities NAC engaged in that gave rise to this lawsuit "cannot logically be cataloged" as

---

[12] The government contractor defense "is a judicially recognized affirmative defense" that "shields contractors only in military equipment procurement contracts and only when the government dictates design specifications." *McMahon*, 460 F. Supp. 2d at 1330; *see also Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988). NAC does not assert that it is entitled to raise this defense here, nor does there appear to be any basis for such an argument, as NAC was not engaged in the manufacturing of military equipment.

combatant. *Johnson*, 170 F.2d at 769. NAC's role was simply to transport cargo. Admittedly, it was carrying military equipment and operating in a war zone, but it was not aiding the military in swinging the "sword of battle"; in essence, it was helping National Airlines carry the sword for the military's later use. *Id.* This is not the type of incidental activity that should qualify as "combatant" for purposes of the FTCA. *See Bixby*, 748 F. Supp. 2d at 1246 (private contractor's restoration of Iraqi infrastructure during wartime did not constitute combatant activity, as it was "more akin to restoring the battlefield to productive use after the battle has ended than to aiding warriors to 'swing the sword'"); *Harris v. Kellogg, Brown & Root Servs., Inc.*, 618 F. Supp. 2d 400, 434 (W.D. Pa. 2009) (maintenance services provide by contractor at military base in Iraq did not constitute combatant activity).

The Court has considered the cases cited by NAC (*see* R. 27, NAC's Resp. at 18), but in addition to being non-binding precedent, the Court finds these cases distinguishable, as they involved paramilitary personnel or activities that were much closer to actual hostilities. *See Saleh*, 580 F.3d at 6-7 (combatant activities doctrine applied to employees of defense contractor conducting interrogations of Iraqi prisoners of war, as these employees were "integrated and performing a common mission with the military under ultimate military command"); *Aiello v. Kellogg, Brown & Root Servs., Inc.*, 751 F. Supp. 2d 698, 712-713 (S.D.N.Y. 2011) (combatant activities doctrine applied to claim of police officer at military base in war zone whose job duties were an "integral part of offensive and defensive combat operations"). Accordingly, the Court finds no merit to this potential defense. Because NAC has failed to establish the elements of federal officer jurisdiction, these cases must be remanded to state court.

## III.   *Hasler* Case

As a final matter, there is a sixth case—*Hasler, et al. v. The Boeing Company, et al.*, No. 1:15-CV-5232 (N.D. Ill. filed Jun. 15, 2015)—that has been consolidated with the others, but which presents a slightly different set of facts.  The *Hasler* case was removed from Cook County Circuit Court on June 15, 2015, approximately two weeks after the other five cases, also on the basis of federal officer jurisdiction.  (*Id.*, R. 1, Notice of Removal.)  As outlined above, this Court has determined that federal officer jurisdiction is not proper based on the facts of these cases.[13]  The matter is complicated, however, because the *Hasler* plaintiffs did not join in the motion to remand filed by the plaintiffs in the other five cases; instead, they filed an amended complaint asserting that diversity jurisdiction exists in their case.  (R. 28, *Hasler* Pls.' Am. Compl. ¶ 33.)  NAC has answered the complaint and "admits that this Court has jurisdiction over this matter."  (*See* R. 31, NAC's Ans. to *Hasler* Pls.' Compl. ¶ 33.)

The parties' "agreement" on this issue is irrelevant, however, because the Court has an independent obligation to ensure that its subject matter jurisdiction is secure.  *See Wisc. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998).  Because this is a removed case, the relevant question is whether federal jurisdiction existed at the time the case was removed.  *See* 28 U.S.C. § 1441(a).  The Court must look to the original complaint as it existed at the time of removal, not to a later-filed complaint.  *See Scouten*, 708 F. Supp. 2d at 731; *see also Gossmeyer v. McDonald*, 128 F.3d 481, 487 (7th Cir. 1996) ("[W]hether subject matter jurisdiction exists is a question answered by looking at the complaint *as it existed at the time the petition for removal was filed*.").

---

[13]  The Court notes that the *Hasler* Plaintiffs' allegations against NAC are materially identical to the allegations raised against NAC in the other five cases, as they all center around the manner in which NAC chose to transport and secure the cargo inside the plane. (*See Hasler*, No. 1:15-CV-5232, R. 1-1, State Compl. ¶ 110.)

Upon review of the *Hasler* Plaintiffs' original complaint, it cannot be discerned whether the requirements of diversity jurisdiction are satisfied. The original complaint does not allege that the amount in controversy exceeds $75,000 and instead asserts generally that the amount in controversy "exceeds the minimum jurisdictional limits of [the state] court," without specifying any particular amount of damages. (*Hasler*, No. 1:15-CV-5232, R. 1-1, State Compl. at 2.) The original complaint also does not delineate the citizenship of each party, including Telair International GmbH, which is listed as a limited liability company. (*See id.* at 1.) With regard to limited liability companies, citizenship "for purposes of . . . diversity jurisdiction is the citizenship of its members." *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998). This "means that it is a citizen of every state of which any member is a citizen." *Mut. Assignment & Indemnification Co. v. Lind-Waldock & Co., L.L.C.*, 364 F.3d 858, 861 (7th Cir. 2004). The citizenship of each member may need to be "traced through multiple levels," where the member is itself a partnership or limited liability company. *Id.* The *Hasler* Plaintiffs' original complaint does not include this information, nor does it address the citizenship of the decedent. *See Lindner v. Union Pacific R.R. Co.*, 762 F.3d 568, 570 (7th Cir. 2014); *see also* 28 U.S.C. § 1332(c)(2) ("[T]he legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent[.]"). The amended complaint suffers from these same deficiencies. (*See* R. 28, *Hasler* Pls.' Am. Compl.) Unless there is complete diversity between the parties, this Court has no jurisdiction to decide the case. *See Schacht*, 524 U.S. at 389 ("The presence of the nondiverse party automatically destroys original jurisdiction: No party need assert the defect. No party can waive the defect or consent to jurisdiction.").

The burden is on NAC to establish that subject matter jurisdiction exists, *Schur*, 577 F.3d at 758, and the only jurisdictional basis asserted by NAC in its notice of removal—federal officer

jurisdiction—has been rejected by this Court. Nevertheless, under 28 U.S.C. § 1653, a party

may be permitted to amend "[d]efective allegations of jurisdiction" at any time. *See Willingham*,

395 U.S. at 407 n.3 (permitting amendment to notice of removal); *Ruppel*, 701 F.3d at 1184 n.1

(noting that defendant could have amended its notice of removal to remedy jurisdictional

deficiencies). The Court will afford NAC an opportunity to file an amended notice of removal

establishing that the requirements of diversity jurisdiction are satisfied in *Hasler*. Any such

notice must be filed within 14 days of the date of this order. If no amended notice is filed by the

deadline, this case will be remanded to state court.

## CONCLUSION

For the foregoing reasons, National Air Cargo, Inc.'s motion to strike (R. 33) is

DENIED. Plaintiffs' motion to supplement (R. 36) is GRANTED. Plaintiffs' joint motion to

remand (R. 23) is GRANTED. Case Numbers 1:15-CV-4727, 1:15-CV-4728, 1:15-CV-4729,

1:15-CV-4730, and 1:15-CV-4732 are REMANDED to Cook County Circuit Court. National

Air Cargo, Inc. is GRANTED fourteen (14) days from the date of this order to file an amended

notice of removal in 1:15-CV-5232 establishing that the requirements of diversity jurisdiction are

satisfied in that case.


ENTERED: _____
                              **Chief Judge Rubén Castillo**
                              **United States District Court**


**Dated: October 5, 2015**